UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

                                             Criminal Action No. 12-20335

vs.                                               HON. MARK A. GOLDSMITH

BRODERICK D. MILLER,

    Defendant.
_____/

**OPINION AND ORDER
DENYING DEFENDANT'S MOTION TO SUPPRESS (DKT. 14)**

### I.    INTRODUCTION

Defendant Broderick D. Miller was indicted for one count of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e), and one count of possession with intent to distribute marijuana in violation of 21 U.S.C. § 841(a)(1). First Superseding Indictment (Dkt. 21). Defendant filed a motion to suppress all evidence obtained as a result of an allegedly invalid traffic stop, including the firearms and controlled substances that form the basis of the current indictment. (Dkt. 14.) The government filed a response (Dkt. 18), and the Court subsequently conducted three evidentiary hearings on the matter on October 16, 2012, November 13, 2012, and November 26, 2012. At the October 16 hearing, the Court asked for supplemental briefing, and each party filed a supplemental brief (Dkts. 19, 20). After the November 26 hearing, the parties filed additional supplemental briefs (Dkts. 23, 24). For the reasons that follow, the Court denies the motion to suppress.

### II.    BACKGROUND

On May 2, 2012, law enforcement officers arrived at 1808 Wolcott Street ("the

1

residence") in Flint, Michigan to conduct surveillance in connection with a search warrant that had been issued for that address.[1] Tr. Vol. I at 16-17, 28-29, 39 (Dkt. 25). Bureau of Alcohol, Tobacco, and Firearms (ATF) Special Agent Mark Kloostra was in charge of organizing and executing the search warrant. Id. at 16. Agent Kloostra testified that he does not recall when the search warrant was issued. Tr. Vol. II at 12-13 (Dkt. 26). After the issuance of the search warrant and prior to May 2, Agent Kloostra conducted surveillance on 1808 Wolcott, during which he saw Defendant. Id. at 12-13.

Agent Kloostra described the required process for executing a search warrant: "I'd have to do an operational plan that has to be approved by our Detroit office. Once that's approved, then I would have to get enough, enough police manpower to execute a warrant which normally is eight to 10 to 12 officers and agents." Tr. Vol. II at 24. Agent Kloostra testified that he could not have executed the search warrant during the surveillance prior to May 2, because he "cannot execute a search warrant by [himself]." Id. at 21.

During the officer's surveillance on May 2, a silver pickup truck, which Agent Kloostra recognized as a vehicle that he had previously seen Defendant drive, arrived at the residence and stayed for about an hour. Id. at 17-18. When Defendant left the residence, Agent Kloostra notified the other officers, id. at 18-19, after which Trooper Shingleton conducted a traffic stop on the vehicle pursuant to Michigan v. Summers, 452 U.S. 692 (1981) (law enforcement officers may detain occupants of premises being searched). Id. at 19. Defendant was placed in handcuffs by Trooper Shingleton, and another officer took the keys from the vehicle and went back to execute the search warrant. Id. at 19.

Agent Kloostra testified that it was important that a traffic stop be conducted on

---

[1] The validity of the search warrant is not contested, and the circumstances surrounding its issuance are not relevant for the present purposes.

2

Defendant in connection with the execution of the search warrant (i) for reasons of officer safety, particularly because there was information that firearms may have been involved; (ii) for retention of evidence; and (iii) "to make sure that the person you're looking for is there at the residence." Tr. Vol. II at 5-6.

At the time of the traffic stop, there were several outstanding bench warrants for Defendant's arrest. Exs. A, B to Gov't Resp. (Dkts. 18-2, 18-3). Trooper Shingleton, who stated that he has conducted hundreds of traffic stops, Tr. Vol. I at 52, testified that he was aware of Defendant's outstanding warrants prior to the traffic stop. Tr. Vol. II at 26. Trooper Shingleton testified that he was informed of the outstanding warrants via a "Nextel [walkie-talkie] conversation with Agent Kloostra some time before the traffic stop." Id. At the first evidentiary hearing, Trooper Shingleton also testified that, prior to the stop, he ran a LEIN check to confirm the existence of outstanding warrants for Defendant's arrest. Tr. Vol. I at 47.

However, at the second evidentiary hearing, Trooper Shingleton stated that he had been mistaken regarding the timing of the LEIN check he ran. Tr. Vol. II at 29. Trooper Shingleton testified that, while the traffic stop was conducted at 3:40 p.m., he did not run a LEIN check on Defendant until 4:19 p.m. Id. at 27, 28. The LEIN search archives show that several LEIN checks on Defendant have been run, including (i) a search by Trooper Shingleton on May 2, 2012, at 4:19 p.m.; (ii) a search by "JJSOPER" on April 30, 2012; and (iii) searches by "HMPOWERS" on February 29, 2012. Gov't Ex. 7. The LEIN records indicate that there were two outstanding warrants for Defendant's arrest for neglect of child support payments. Gov't Ex. 6.

Agent Kloostra testified that he believes he "did know that [Defendant] had outstanding warrants at that time [of the traffic stop]." Tr. Vol. I at 17. He further testified that it was his

3

habit and practice to determine whether an individual in question has outstanding warrants prior to the execution of a search warrant. Id. at 33. He testified that it was also his habit to provide information about outstanding warrants to the other officers involved in conducting a search warrant, and he testified that "I would have obviously provided that information to the state uniformed officers that were with me on that day." Id. at 17. Later, Agent Kloostra testified that he did not recall whether a search into Defendant's background prior to May 2 revealed outstanding warrants for Defendant's arrest, and he did not recall specifically telling Trooper Shingleton about any outstanding warrants for Defendant. Id. at 36, 37-38. At the second evidentiary hearing, Agent Kloostra testified that he believed he did advise Trooper Shingleton that Defendant had an outstanding warrant, although he did not recall when he told Trooper Shingleton that information. Tr. Vol. II at 22.

ATF Special Agent Harry Powers, who previously assisted Agent Kloostra with some aspects of Defendant's case, also testified. Tr. Vol. II at 44. On February 29, 2012, Agent Powers ran a LEIN warrant check on Defendant. Id. at 47; Gov't Ex. 6. Agent Powers testified that he informed Agent Kloostra of the outstanding arrest warrants for Defendant, and that he believed he verbally informed Agent Kloostra on February 29, 2012. Tr. Vol. II at 52-53. Agent Powers further testified that the LEIN search conducted on April 30, 2012, by "JJSOPER," Gov't Ex. 7, was conducted by ATF Special Agent Jim Soper, and that Flint field agents preparing to execute a search warrant must contact Agent Soper in order for him to approve the plan for executing the search warrant. Tr. Vol. II at 49-50.

The officers entered the residence using the key that was found in Defendant's truck. Id. at 20. During the search of the residence, the officers seized bags of suspected marijuana and two pistols. Affidavit of Mark Kloostra (attached to Criminal Complaint, Dkt. 1). After the

search of the residence was concluded, Trooper Shingleton took Defendant to the County Jail. Tr. Vol. I at 20. Although Agent Kloostra initially told Trooper Shingleton to release Defendant after the execution of the search warrant, Tr. Vol. II at 33, Trooper Shingleton testified that this was due to confusion about whether the County Jail would lodge Defendant on the outstanding child support warrants. Tr. Vol. I at 57. Trooper Shingleton informed Agent Kloostra that the jail would lodge Defendant on the outstanding warrants. Id. at 57. Additionally, Defendant's truck was seized, and an inventory search was subsequently conducted, revealing $263 in cash. Id. at 20.

Two civilian witnesses testified at the evidentiary hearings: (i) Stephen Michael McDonough, who lives at 1813 Wolcott Street, Tr. Vol. II at 55; and (ii) Mystie Summers, who is Defendant's sister. Tr. Vol. III at 6 (Dkt. 27). Mr. McDonough testified that he saw several police officers go to Defendant's house, and he also saw a "vehicle couple hundred yards up on Wolcott." Tr. Vol. III at 57-58. Mr. McDonough testified that two officers removed handcuffs from Defendant and then put the handcuffs back on. Id. at 61. Mr. McDonough testified that, "[a]t one moment they were going to let Mr. Miller go and then it's like something different had happened and they re-handcuffed him." Id. Mr. McDonough also remembered one of the officers saying the word "warrant." Id. at 66.

Ms. Summers testified that someone called her phone to tell her that Defendant was being arrested on Wolcott Street. Tr. Vol. III at 6. Ms. Summers then drove to Wolcott and parked on the opposite side of the street and several houses down from 1808 Wolcott. Id. at 7, 16. Ms. Summers testified that she saw an officer across the street from her location. Id. at 17. She described him as tall, white, and not wearing a uniform; she could not remember whether he was wearing a hat or whether he had facial hair. Id. at 17-18. She stated that he was on his cell

phone talking to somebody about warrants, and that he said "something like don't let him go." Id. at 8-9. She testified that the officer was driving what she recognized as an undercover truck, id. at 20, and that she knew he was an officer because he was talking about warrants. Id. Ms. Summers testified that she loves her brother and that "[n]obody wants their loved one to go to jail or prison." Id. at 21-22.

### III.   ANALYSIS

At a suppression hearing, the Government has the burden of demonstrating, by a preponderance of the evidence, that the search or seizure was not a constitutional violation. See United States v. Bradley, 163 F. App'x 353, 357 (6th Cir. 2005) (citation omitted). The Court concludes that the government has met this burden with regards to both the search of the residence and the traffic stop.

#### A.   Evidence Relating to the Search of the Residence

##### 1. Parties' arguments

Defendant's motion seeks to exclude "[a]ll evidence obtained as a result of the stop." Mot ¶ 6 (Dkt. 14). At the October 16 hearing, Defendant's attorney clarified that he sought to exclude the evidence found inside the residence as well as the evidence found inside the vehicle. Tr. Vol. I at 65-66 (Dkt. 25).

The Government argues that the inevitable discovery doctrine bars suppression of the evidence found inside the home because the officers had a valid search warrant for the home, and "thus had the authority to forcibly enter the home in order to execute the warrant." Gov't 1st Supp. Br. at 8 (Dkt. 19). The Government analogizes this situation to cases in which courts have found that an officer's violation of the knock-and-announce rule does not require suppression of evidence found inside the home when the officer possessed a valid search warrant for the

6

residence, because the evidence would have been inevitably discovered in the execution of the search warrant. Id. at 8-10. In short, the Government argues that where the officers have a right to entry, an impermissible manner of entry "does not necessarily trigger the exclusionary rule." Id. at 10. The Government further contends that the deterrent purpose of the exclusionary rule would not be served by suppressing the evidence found inside Defendant's residence. Id. at 11.

Defendant argues in response that the inevitable discovery rule is not necessarily applicable to the facts of the instant case. Def. 1st Supp. Br. at 6-7 (Dkt. 20). Defendant contends that five days passed between the authorization of the search and the execution of the search warrant, and "it is entirely possible that it would have been another five days before authorities executed the search warrant." Id. at 6-7. Defendant argues that "[u]nder these facts, suppression of the key is not the only remedy available to defendant. The government should also be precluded from introducing evidence that the items found inside the residence were seized immediately after defendant was seen leaving the premises." Id. (emphasis in original). Defendant further argues that the inevitable discovery doctrine should not put the prosecution in a better position than it would have been without the unlawful conduct, and that "the government has not established that the search of the residence would have taken place at the same time that it actually took place had Trooper Shingleton not seized defendant's person and effects." Id. at 6-7. Defendant therefore seeks to suppress "evidence that the search of the house was close in time to the stop of defendant." Id. at 7.

### 2. Discussion

The Supreme Court has explained the exclusionary rule as follows:

The exclusionary rule prohibits introduction into evidence of tangible materials seized during an unlawful search . . . . Beyond that, the exclusionary rule also prohibits the introduction of derivative evidence, both tangible and testimonial, that is the product of the primary evidence, or that is otherwise acquired as an

7

> indirect result of the unlawful search, up to the point at which the connection with the unlawful search becomes "so attenuated as to dissipate the taint."

Murray v. United States, 487 U.S. 533, 536-537 (1988) (citations omitted). The Supreme Court has also adopted the inevitable discovery exception to the exclusionary rule. Nix v. Williams, 467 U.S. 431, 444 (1984). The Court held, "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." Id.

The inevitable discovery exception "requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." United States v. Kennedy, 61 F.3d 494, 498 (6th Cir. 1995) (citations and quotation marks omitted). The Sixth Circuit has explained that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate either the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence or other compelling facts establishing that the disputed evidence inevitably would have been discovered." Id. at 499 (emphasis in original). "The government can satisfy its burden by showing that routine procedures that police would have used regardless of the illegal search would have resulted in the discovery of the disputed evidence." United States v. Ford, 184 F.3d 566, 577 (6th Cir. 1999) (citation omitted). The inevitable discovery doctrine is meant to "ensure that the Government is not put in a worse position because of misconduct than it would have been absent the misconduct." United States v. Alexander, 540 F.3d 494, 504 (6th Cir. 2008).

The Court first concludes that the inevitable discovery exception applies here and precludes suppression of the evidence found inside the residence. Because the officers

8

discovered the evidence during the execution of an indisputably valid search warrant, the Government has established that the evidence would inevitably have been uncovered by an independent, untainted investigation. See United States v. Mendizabal, 214 F. App'x 496, 500 (6th Cir. 2006). Furthermore, it does not matter that the officers used a key found in the traffic stop to open the door, because the officers were authorized to enter the residence with or without a key. Therefore, the Government has shown by a preponderance of the evidence that even if the allegedly unlawful traffic stop had never occurred, the officers would have found the evidence inside the house through the lawful execution of a search warrant.

The Court next turns to whether the inevitable discovery doctrine precludes suppression of (i) the evidence that Defendant exited the house shortly before the firearms and contraband were found inside the residence and (ii) the evidence that the search of the house occurred a short time after the traffic stop of Defendant.

The Court concludes that due to the inevitable discovery doctrine, the evidence that the search occurred shortly after Defendant left the residence need not be excluded. The Government has presented evidence that on May 2 the officers were engaged in routine surveillance procedures in anticipation of executing the search warrant. Therefore, the officers witnessed Defendant leave the residence through their routine and lawful surveillance procedures. Even if the officers had then commenced the search of the residence without stopping Defendant, the officers would have been able to testify as to Defendant's presence in the house shortly before the evidence was found inside the house. Therefore, excluding this evidence would result in putting the prosecution in a worse position than it would have been if the allegedly unlawful traffic stop had never occurred.

Furthermore, although Defendant argues that (i) the officers waited five days to execute

9

the warrant, and (ii) if Defendant had not been stopped, the officers may have waited five more days; the Court concludes that the preponderance of the evidence in the record shows that the officers were planning to execute the search warrant on May 2, 2012. Agent Kloostra testified that the five days after the authorization of the warrant were spent on required procedures in preparation for executing the search warrant, and that on May 2 Agent Kloostra and several other officers went to conduct surveillance in preparation for executing the search warrant.

The Court further concludes, however, that Defendant is correct that the inevitable discovery exception would not apply to the evidence of the timing of the traffic stop in relation to the timing of the search. If, as Defendant contends, the traffic stop was invalid, then the evidence of its timing in relation to the search should be suppressed because such evidence would be derivative of an invalid Fourth Amendment stop. However, because the Court concludes below that the traffic stop was lawful, Defendant's argument on this point does not provide a valid ground for suppression of evidence.

### B. Evidence Found During the Search of Defendant's Person and Car

#### 1. Parties' arguments

Defendant seeks to suppress the key and cash found in Defendant's car pursuant to the allegedly unlawful traffic stop. Tr. Vol. I at 65-66 (Dkt. 25); Def. Mot. ¶¶ 2, 6 (Dkt. 14). Defendant argues that although Michigan v. Summers, 452 U.S. 692 (1981), held that police officers may detain occupants of a premises while conducting a valid search on the premises, the issue of whether an officer may detain an individual who has left the immediate vicinity of the premises will be addressed by the Supreme Court next term in Bailey v. United States, No. 11-770. Def. Mot. at 4-5. Defendant argues that if the Court proceeds with the motion (instead of holding the case in abeyance until Bailey is decided), the evidence from the traffic stop should be

10

suppressed. Id. at 4. Defendant further contends that none of the three rationales supporting detention under Summers was supported by the traffic stop in the instant case, and therefore the stop was not valid. Id. at 5. Defendant also argues that he was not detained as soon as practicable after departing the residence, so under the Sixth Circuit's interpretation of Summers, the traffic stop was not lawful. Id.

The Government argues in response that Defendant was stopped and arrested on his outstanding bench warrants, and not pursuant to the execution of the search warrant. Gov't Resp. at 3 (Dkt. 18). The Government concedes that "knowledge of the outstanding warrants was necessary in order to effectuate a traffic stop on those grounds," and contends that the evidence shows that Trooper Shingleton did have knowledge of the warrants at the time of the stop. Gov't 1st Supp. Br. at 2-4 (Dkt. 19). The Government argues that, in the alternative, that the stop was valid under Michigan v. Summers, because Defendant was detained as soon as practicable after he left the residence. Id. at 4-5.

In Defendant's first supplemental brief, he argues that the traffic stop was invalid because Trooper Shingleton did not have grounds for effectuating the traffic stop until he ran the warrant check, some time after the traffic stop was completed. Def. 1st Supp. Br. at 2. Defendant argues that there is insufficient evidence that Agent Kloostra told Trooper Shingleton about the outstanding warrants prior to the traffic stop, because Agent Kloostra could not recall whether he told Trooper Shingleton about the warrants at all. Id.

In the Government's second supplemental brief, it argues that the following evidence in the record shows that Trooper Shingleton knew of the outstanding warrants prior to effectuating the traffic stop of Defendant: (i) Agent Kloostra had reviewed Defendant's criminal history – which revealed Defendant's outstanding warrants – prior to May 2; (ii) Agent Powers learned of

11

Defendant's outstanding warrants and informed Agent Kloostra about the warrants on February 29, 2012; (iii) Agent Soper also ran a LEIN check on Defendant; and (iv) Trooper Shingleton testified that Agent Kloostra notified him by walkie-talkie of the outstanding warrants prior to the traffic stop. Gov't 2d Supp. Br. at 2-4 (Dkt. 23). The Government also argues that the testimony of the defense witnesses does not support the motion to suppress. Id. at 5. The Government contends that (i) Mr. McDonough's testimony was consistent with the testimony of Agent Kloostra and Trooper Shingleton, id. at 6; and (ii) Ms. Summers' testimony lacks credibility because she was "understandably biased in favor of her brother," id. at 8, and because her testimony was inconsistent with the testimony of Agent Kloostra and Trooper Shingleton, id.

In Defendant's second supplemental brief, Defendant argues that the following evidence indicates that Trooper Shingleton did not know of the existence of the warrants until after the traffic stop: (i) Trooper Shingleton did not confirm the existence of the warrants until after the stop; and (ii) Agent Kloostra was unsure if he ever told Trooper Shingleton about the outstanding warrants. Def. 2d Supp. Br. at 3 (Dkt. 24). Defendant also contends that the law enforcement interests underlying the Michigan v. Summers doctrine did not justify the traffic stop of Defendant. Id. at 5. Defendant argues that the concerns for officer safety and preventing destruction of evidence were greatly diminished because Defendant was a block away from the residence at the time he was stopped. Id. at 5-7.

**2. Discussion**

The Government has proposed two grounds on which the traffic stop was valid: (i) at the time Trooper Shingleton effectuated the traffic stop, he was aware that Defendant had outstanding warrants for his arrest; and (ii) the traffic stop was conducted pursuant to the execution of a search warrant under Michigan v. Summers. The Court concludes that the

Government is correct in regards to both of the grounds, and that either suffices to justify the traffic stop.

### a. Outstanding warrants

An officer may stop or arrest an individual if the officer knows that the individual has outstanding warrants for his arrest. In <u>United States v. White</u>, 162 F. App'x 520, 523 (6th Cir. 2006), the Sixth Circuit addressed the following issue: "consistent with the Fourth Amendment, under what circumstances may a law enforcement officer stop a person in order to determine whether he is the individual for whom an arrest warrant has been issued?" The court concluded that a law enforcement officer may stop a person under those circumstances if the officer "had reasonable suspicion, based on all the facts presented to them, to believe that [the person for whom the arrest warrant was issued] was an occupant of the vehicle." <u>Id.</u> See also <u>Smoak v. Hall</u>, 460 F.3d 768, 779 (6th Cir. 2006) ("Reasonable suspicion need not arise from an officer's direct observation, but can be based on informant tips and dispatcher information.").

In this case, the parties do not dispute that knowledge of the warrants would be necessary for Trooper Shingleton to have effectuated the traffic stop on those grounds; nor do the parties dispute that if Trooper Shingleton had such knowledge, the traffic stop would be lawful. Instead, the parties dispute whether Trooper Shingleton in fact had knowledge of the outstanding warrants at the time of the arrest.

The Court concludes that the preponderance of the evidence supports a finding that Trooper Shingleton did know about the outstanding warrants at the time he effectuated the traffic stop. First, Trooper Shingleton testified that he did know about the warrants before the traffic stop; specifically, he testified that Agent Kloostra informed him of the warrants via Nextel communication. This testimony is credible but not dispositive; Trooper Shingleton's confusion

regarding the timing of the warrant check he ran on Defendant casts some doubt on the clarity of his recollection about the timing of Agent Kloostra's communication to him.

However, the Court further determines that additional evidence in the record supports a finding that Trooper Shingleton knew about the outstanding warrants at the time of the traffic stop. The LEIN records show that Agent Powers ran a warrant check on Defendant on February 29, and Agent Powers testified that he informed Agent Kloostra of the outstanding warrants that day. Therefore, Agent Kloostra had knowledge at the time of the traffic stop of the outstanding warrants. Furthermore, Agent Kloostra's inability to remember at the evidentiary hearing whether he knew about the warrants before the traffic stop does not overwhelm the evidence that he did know of the warrants, given that about six months have passed since the traffic stop. Therefore, Agent Powers' testimony provides additional evidence supporting Trooper Shingleton's assertion that Agent Kloostra informed him of the warrants. Finally, the following evidence supports a finding that Agent Soper informed Trooper Shingleton and the other officers of the outstanding warrants shortly before May 2, 2012: (i) Agent Soper ran a LEIN warrant check on Defendant on April 30, 2012, and (ii) Agent Kloostra testified that field agents preparing to execute a search warrant must be in touch with Agent Soper so that he can approve their plan.

Finally, the Court concludes that the testimony of the defense witnesses does not support a finding that Trooper Shingleton was unaware of the warrants prior to the traffic stop. As the Government contends, Mr. McDonough's testimony regarding two officers un-handcuffing and then re-handcuffing Defendant is consistent with Trooper Shingleton's testimony that there was some confusion between him and Agent Kloostra about whether the County Jail would lodge Defendant on outstanding child support warrants. Furthermore, the Court concludes that Ms.

14

Summers' testimony describing an officer in plain clothes who was talking about arresting Defendant after a discovery of outstanding warrants is not highly credible, for two reasons: (i) Ms. Summers is Defendant's sister, and she testified that she loves him and doesn't want him to go to jail; and (ii) her testimony is inconsistent with the testimony of Trooper Shingleton and Agent Kloostra, and is not supported by the testimony of Mr. McDonough.

### b. Summers doctrine

In Michigan v. Summers, 452 U.S. 692, 705 (1981), the Supreme Court stated, "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." The Court explained:

> In assessing the justification for the detention of an occupant of premises being searched for contraband pursuant to a valid warrant, both the law enforcement interest and the nature of the "articulable facts" supporting the detention are relevant. Most obvious is the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found. Less obvious, but sometimes of greater importance, is the interest in minimizing the risk of harm to the officers. Although no special danger to the police is suggested by the evidence in this record, the execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation. Finally, the orderly completion of the search may be facilitated if the occupants of the premises are present. Their self-interest may induce them to open locked doors or locked containers to avoid the use of force that is not only damaging to property but may also delay the completion of the task at hand.

Id. at 702-703 (citations and footnotes omitted).

In United States v. Cochran, 939 F.2d 337, 339 (6th Cir. 1991), the Sixth Circuit stated:

> In Summers, police stopped the individual as he was "descending the front steps." In contrast here, police stopped defendant after he had driven a short distance from his home. We do not find this distinction significant, however. Summers does not impose upon police a duty based on geographic proximity (i.e., defendant must be detained while still on his premises); rather, the focus is upon police performance, that is, whether the police detained defendant as soon as

> practicable after departing from his residence. Of course, this performance-based duty will normally, but not necessarily, result in detention of an individual in close proximity to his residence.

Furthermore, in United States v. Head, 216 F. App'x 543, 546-547 (6th Cir. 2007), the Sixth Circuit held that under Summers and Cochran, a traffic stop of the defendant approximately one mile from his residence pursuant to the execution of a search warrant was effectuated as soon as practicable, and was not a violation of the defendant's Fourth Amendment rights.

Because the officers in this case had a valid warrant to search the residence, the issue before the Court is whether the traffic stop was effectuated as soon as practicable after Defendant left the residence. The testimony presented at the evidentiary hearings indicates that immediately after Defendant left the residence, one of the officers stationed to observe the residence sent a radio message to Trooper Shingleton that Defendant had left. Trooper Shingleton then stopped Defendant approximately one block away from the residence. The Court concludes that this stop was effectuated "as soon as practicable" after Defendant left; furthermore, under the analysis in Cochran and Head, stopping Defendant approximately one block from the residence is reasonable. For these reasons, the Court concludes that the traffic stop was justified under the Summers doctrine.

Defendant argues that the law enforcement rationales justifying the Summers doctrine were inapplicable to the instant case. The Court disagrees. If Defendant had returned unexpectedly to the residence while the officers were in the middle of executing the search warrant, the situation may have presented a risk to officer safety and to the retention of evidence. Defendant also contends that Cochran may not be good law much longer, because the pending Supreme Court case United States v. Bailey will consider the issue of whether Summers allows for the detention of occupants after the occupants have left the residence being searched.

However, the Court will not endeavor to predict how Bailey will be decided, and until it is decided one way or the other, Summers and Cochran remain binding law on this Court. And under those cases, the traffic stop at issue here was lawful.

### IV. CONCLUSION

For the reasons discussed above, the Court concludes that neither the evidence found in the residence nor the evidence found in the car should be suppressed. Therefore, the Court denies Defendant's motion to suppress (Dkt. 14).

SO ORDERED.

Dated: January 9, 2013　　　　　　　　　　　　s/Mark A. Goldsmith
　　　　Flint, Michigan　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 9, 2013.

　　　　　　　　　　　　　　　　　　　　　　　s/Deborah J. Goltz
　　　　　　　　　　　　　　　　　　　　　　　DEBORAH J. GOLTZ
　　　　　　　　　　　　　　　　　　　　　　　Case Manager